NO. _____23-6246_____

In The

# United States Court of Appeals

For The Fourth Circuit

ANDREW FIELDS, III

Plaintiff - Appellant

v.

FEDERAL BUREAU OF PRISONS, et al.

Defendant - Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA        AT ROANOKE

BRIEF OF APPELLANTS

John F. Preis
804-289-8682
Professor of Law, University of Richmond
203 Richmond Way
University of Richmond, VA 23173

Danny Zemel
804-774-7950
The Krudys Law Firm, PLC
919 East Main Street, Suite 2020
Richmond, VA 23221

Counsel for Appellant

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _23-6246_    Caption: _Fields v. Federal Bureau of Prisons, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Andrew Fields, III_
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.


Signature: s/ Danny Zemel _____         Date: _____08/15/2023_____

Counsel for: Appellant _____

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................... I

TABLE OF AUTHORITIES ........................................................ II

JURISDICTIONAL STATEMENT ............................................... 1

STATEMENT OF ISSUES ........................................................... 1

STATEMENT OF THE CASE ....................................................... 1

SUMMARY OF ARGUMENT ....................................................... 5

ARGUMENT .................................................................................. 6

   **I.**    **Standard of Review.** ......................................................... 6

   **II.**   *Egbert* **Confirms that** *Bivens* **Extensions are Available, and the Special Factors Analysis Must Reflect This.** ........................................ 7

   **III.**   **Special Factors Do Not Counsel Hesitation in this Case.** .................... 11

     A.   The Uncertainty of Systemwide Consequences ......................................... 13

     B.   Impact on Officers' Discharge of Their Duties ......................................... 17

     C.   The Existence or Clear Rejection of Alternative Remedies ....................... 20

       1.   The BOP's Administrative Remedy Program Does Not Block an Extension ................................................................. 20

       2.   FTCA Remedies Are Not Relevant Here ............................................ 25

**CONCLUSION** .................................................................................. **28**

**STATEMENT REGARDING ORAL ARGUMENT** ........................................ **28**

# TABLE OF AUTHORITIES

## CASES

*Alsop v. Federal Bureau of Prisons,*
  No. 22-1933, 2022 U.S. App. LEXIS 30806 (3d Cir. Nov. 7, 2022) ------------- 25
*Bivens v. Six Unknown Named Agents,*
  403 U.S. 388 (1971)-------------------------------------------------------------------7
*Bosse v. Oklahoma,*
  580 U.S. 1 (2016)------------------------------------------------------------------- 27
*Bush v. Lucas,*
  462 U.S. 367 (1983)-------------------------------------------------------------- 26
*Carlson v. Green,*
  446 U.S. 14 (1980) -------------------------------------------------------7, 25, 26
*Chappell v. Wallace,*
  462 U.S. 296 (1983)-------------------------------------------------------------- 23
*Correctional Services Corporation v. Malesko,*
  534 U.S. 61 (2001) -------------------------------------------------------7, 16, 23
*Davis v. Passman,*
  442 U.S. 228 (1979),-----------------------------------------------------------------7
*Egbert v. Boule,*
  142 S. Ct. 1793 (2022)---------------------------------------------------- *passim*
*Erickson v. Pardus,*
  551 U.S. 89 (2007) -----------------------------------------------------------------7
*Greene v. United States,*
  No. 21-5398, 2022 U.S. App. LEXIS 25630 (6th Cir. Sept. 13, 2022) ---------- 25
*Hernandez v. Mesa,*
  140 S. Ct. 735 (2019) --------------------------------------------------------------8
*Mack v. Yost,*
  968 F.3d 311 (2020)-------------------------------------------------------------- 25
*Mays v. Smith,*
  70 F.4th 198 (4th Cir. 2023) --------------------------------------------- 10, 14, 15
*Moore v. Bennette,*
  517 F.3d 717 (4th Cir. 2008)------------------------------------------------------6
*Rodriguez de Quijas v. Shearson/American Express Incorporated,*
  490 U.S. 477 (1989)-------------------------------------------------------------- 27
*Ross v. Blake,*
  578 U.S. 632 (2016)-------------------------------------------------------------- 22
*Schweiker v. Chilicky,*
  487 U.S. 412 (1988)-------------------------------------------------------------- 26

*Silva v. United States*,
    45 F.4th 1134 (10th Cir. 2022) ------------------------------------------ 25

*Tate v. Harmon*,
    54 F.4th 839 (4th Cir. 2022) -------------------------------------- 12, 19, 28

*United States v. Danielczyk,*
    683 F.3d 611 (4th Cir. 2012) ----------------------------------------- 27

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) ----------------------------------------- 6

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ------------------------------------------ *passim*

## <u>STATUTES</u>

28 U.S.C. § 1291 ------------------------------------------------------- 1

42 U.S.C. § 1997e(a) ------------------------------------------------- 22

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because the Appellant, Andrew Fields, III, seeks review of a "final decision[]" of a "district court[] of the United States." The district court in this matter entered a final judgment on January 31, 2023 and Appellant timely filed a notice of appeal on March 13, 2023.

## STATEMENT OF ISSUES

Whether, in light of *Egbert v. Boule*, 142 S. Ct. 1793 (2022), a person subjected to excessive force in violation of the Eighth Amendment may seek damages from the individuals who committed the constitutional violation.

## STATEMENT OF THE CASE

In the fall of 2021, Andrew Fields, III was incarcerated at the United States Penitentiary in Lee County, Virginia. During this period, Fields endured numerous violations of his rights, including physical abuse, retaliation for protected conduct, seizure of property, denial of access to a grievance process, and deprivation of medical care. JA 009-026.

Many of the violations in this case can be traced November 10, 2021, when Fields was summoned to a meeting with several prison personnel, ostensibly to discuss his apparent failure to carry an "inmate movement pass" while outside his housing unit. JA 010. The timing of this discussion, however, is suspect because, on

1

the preceding day, Fields had sent a letter to prison authorities regarding problems at another federal facility (USP Lewisburg). JA 009. Indeed, during the meeting, Fields was searched by several guards who found—and permanently seized—five legal documents that Fields had inside his shirt. JA 012. Inexplicably, the guards also seized Fields' shoes and prescription glasses, neither of which were ever returned. JA 012.

After the meeting, a guard escorted Fields to the Special Housing Unit ("SHU"), a punishment that was imposed on Fields at the meeting. JA 013. On the way to the SHU, however, Fields momentarily glanced in a direction that raised the guard's ire. JA 013. Immediately, the guard began punching the plaintiff in the face with closed fists. JA 013. Fields fell the ground, but the abuse only continued with the guard stomping on him with steel-toed boots. JA 013. Fields finally made it to the SHU, but only with the assistance of a wheelchair. JA 013.

Once in the SHU, a nurse falsely accused Fields of misconduct, which then triggered another round of abuse by multiple guards—including punching, kicking, and ramming Fields' head into the concrete wall. JA 014-017. At some point after the beating, a nurse arrived to perform a temperature check. During this visit, the nurse accused Fields of lying to her and, as punishment for that, refused to provide him with medication. JA 018.

Fields remained in the SHU and was subject to periodic checks. JA 018. These "checks," however, were little more than another occasion for harassment and abuse, including threats of harm, false accusations of misconduct, and outright physical attacks. JA 019-023. Finally, after 24 hours in the SHU, Fields was returned to his ordinary housing unit. JA 023.

After his return, Fields turned to the task of reclaiming the items that had been seized from him, including important legal documents, his shoes, and his glasses. Receiving little help from the guards, he attempted to file a formal grievance. JA 024-025. Yet even that effort was stymied when personnel refused to provide Fields with access to the necessary forms. JA 026.

Based upon these events, Fields filed a *pro se* complaint on January 19, 2022 against several prison officers and the Bureau of Prisons. JA 007. The district court prescreened the complaint pursuant to 28 U.S.C. § 1915(a) and, on January 31, 2023, dismissed all claims as well as a motion it regarded as moot.[1] *See* JA 095-108.

---

[1] The district court dismissed as moot Fields' motion to have the U.S. Marshals Service serve process. JA 095. Although prisoners who qualify for *in forma pauperis* status are not responsible for serving process, Fields was unable to qualify for reasons outside his control. JA 003. After unsuccessfully attempting to effectuate service on his own, Fields filed the motion seeking to have the U.S. Marshals Service effectuate service on his behalf. JA 092-093. At the time, the district court dismissed this motion; it is unclear how much time remained for service to be completed, though it appears that some time did remain.

In its decision, the district court first held that Fields' allegations involving deprivation of property, deprivation of medical care, and the denial of access to a grievance process failed to state a violation of his constitutional rights. JA 098-099. Second, turning to Fields' allegations of retaliation and excessive force, the district court held that those claims were not supported by an implied damages remedy. JA 100. Purporting to follow the Supreme Court's recent decision in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), the district court found that both claims arose in a "new context" and that "special factors" counseled against recognizing an implied cause of action. JA 103-107.

With regard to the excessive force claim,[2] the district court first noted that Fields' excessive force claim arose in new context. No previous Supreme Court case "involved Eighth Amendment claims alleging an improper use of force by BOP officers." JA 103. The court then turned to the issue of whether special factors counseled against recognizing a damages remedy in this context. JA 104.

The district court held that special factors did exist and noted three in particular: (1) Congress's superior positioning to determine whether a damages remedy ought to be available, (2) the importance of not "entangl[ing] the federal judiciary in

---

[2] Fields only seeks appellate review of the district court's excessive force ruling. For that reason, only that aspect of the court's ruling is discussed here.

byzantine issue of prison administration and institutional security," and (3) the existence of alternative remedies through the "Bureau of Prison's administrative remedy program." JA 104-107.

Following this decision, Fields timely filed a notice of appeal on March 13, 2023 and—still acting *pro se*—filed an informal brief on March 27, 2023.  In June 2023, however, Fields retained pro bono counsel who sought leave to file a formal brief. This Court granted that request on July 6, 2023.

## SUMMARY OF ARGUMENT

In *Egbert v. Boule*, 142 S. Ct. 1793 (2022), the Supreme Court made clear that lower courts may recognize *Bivens* actions in at least some new contexts. Fields' excessive force claim falls into one such context because he is not asking this Court to approve "whole categories" of new claims as the Supreme Court has warned against. *Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017). Rather, Fields only asks this Court to recognize an exceedingly narrow extension that will uncommonly arise: an Eighth Amendment excessive force claim where the Bureau of Prisons' (BOP) administrative remedy program is not operational.

Recognizing such a claim is permissible and appropriate because special factors—as the term is properly understood—do not counsel hesitation. First, in evaluating special factors here, this Court must respect the Supreme Court's explicit decision in *Egbert* to retain the two-step inquiry (*i.e.*, first, does a damages action

arise in a "new context" and, second, do "special factors counsel hesitation") and to leave the door open for potential extensions. Applying a special factor in a way that would, in effect, block *all* extensions of *Bivens* would violate controlling precedent.

Second, with this proper understanding of special factors in mind, there are no factors that bar the recognition of a cause of action here. Recognizing a cause of action would neither produce unacceptable systemwide consequences nor inappropriately interfere with officers' discretionary authority in the discharge of their duties. Further, because a rogue officer denied Fields access to the BOP administrative remedy program, implying a cause of action here would not interfere with Congress' or the Executive's chosen method of deterring wrongful conduct. Thus, the narrow extension sought here may, and should, be granted.

## ARGUMENT

### I.    Standard of Review.

A dismissal for failure to state a claim pursuant to the screening required by the Prisoner Litigation Reform Act (PLRA) is reviewed de novo. *Moore v. Bennette*, 517 F.3d 717, 728 (4th Cir. 2008). PLRA screenings for failure to state a claim apply the same standard as under Rule 12(b)(6). *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). According, the facts as pled must be accepted as true and all reasonable inferences much be made in the Plaintiff's favor. *Id*. Further, when conducting a

PLRA review, a liberal construction must be given to the pleadings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

## II. *Egbert* Confirms that *Bivens* Extensions are Available, and the Special Factors Analysis Must Reflect This.

It is no secret that the Supreme Court is skeptical of *Bivens* actions. Indeed, after *Egbert v. Boule*, 142 S. Ct. 1793 (2022), one may be tempted to conclude that *Bivens* actions are limited only to the precise contexts presented in the three cases where a cause of action has been approved: *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971)*; Davis v. Passman*, 442 U.S. 228 (1979); and *Carlson v. Green*, 446 U.S. 14 (1980). Cases outside of these contexts seek an "extension" of *Bivens,* and extensions, the argument goes, are a relic of the "the heady days in which [the federal courts] assumed common-law powers to create causes of action." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring).

This view of the Court's *Bivens* jurisprudence is incorrect. As explained below, the Court's recent decision in *Egbert* makes abundantly clear that the standard two-step framework that has long applied in *Bivens* cases continues to apply, and that implicit in that framework is that extensions of *Bivens* are, in rare cases, entirely permissible and appropriate.

*Egbert* involved excessive force and retaliation claims brought by Robert Boule against Erik Egbert, a federal border security agent. At issue before the Court

was whether Boule had a cause of action. In analyzing the question, the Court began

by laying out its traditional *Bivens* analysis:

> First, we ask whether the case presents a new *Bivens* context—*i.e.*, is it
> meaningfully different from the three cases in which the Court has im-
> plied a damages action. Second, if a claim arises in a new context, a
> *Bivens* remedy is unavailable if there are special factors indicating that
> the Judiciary is at least arguably less equipped than Congress to weigh
> the costs and benefits of allowing a damages action to proceed.
>
> *Egbert*, 142 S. Ct. at 1803 (internal quotation marks and citations omitted).

The Court then explained that "[w]hile our cases describe two steps, those

steps *often* resolve to a single question: whether there is any reason to think that

Congress might be better equipped to create a damages remedy." *Id*. (emphasis

added). The Court's characterization of its traditional two-step inquiry as *often (*but

not *always*) reducing to a "single question," was based on the overlap often found

between factors indicating a claim arises in a new context and factors counseling

hesitation. *Id*. The Court did not abandon its two-step approach, and nowhere

indicated that it was overruling *Hernandez v. Mesa*, 140 S. Ct. 735 (2019), *Ziglar*,

or other previous *Bivens* decisions that utilized the two-step approach.

Instead, the Court applied the two-step approach in rejecting Boule's request

for an extension of *Bivens*. The Court first accepted the Ninth Circuit's conclusion

that Boule's claim arose in a "new context." *Egbert*, 142 S. Ct. at 1804. It then

declined to recognize a cause of action because "Congress is better positioned to

create remedies in the border-security context, and the Government already has

provided alternative remedies that protect plaintiffs like Boule." *Id*. at 1807. If extensions of *Bivens* were categorically barred, then there would be no reason to even consider whether special factors exist that counsel hesitation.

The unmistakable implication of the Court's analysis is that extensions of *Bivens* will be available in at least some cases. If there were any doubt about this, however, Justice Gorsuch's concurring opinion in *Egbert* reinforced the point. Justice Gorsuch refused to join the majority opinion and concurred only the ultimate judgment that no *Bivens* action was available. *Id.* at 1809 (Gorsuch, J., concurring). The problem with the majority opinion, Justice Gorsuch opined, was its "case-specific" approach—*i.e.*, an approach that focuses on the costs and benefits of each individual extension. *Id.* at 1810. In his view, a better approach was to prohibit *all* extensions, regardless of the context. *Id*. If the Court's practice was to deny an extension each time it was sought, better to simply adopt that as a strict rule rather than create "false hope, and in the process invite still more protracted litigation destined to yield nothing." *Id*. (internal quotation marks and citation omitted).

Of course, Justice Gorsuch wrote only for himself. His view did not command a single other vote. The inescapable conclusion is that eight of the nine justices desired to retain the traditional *Bivens* framework and do not view a request for a *Bivens* extension as a "false hope" that is "destined to yield nothing." Rather, *Bivens* extensions will be available in at least some circumstances. This is not to say that

extensions may be easily granted; the majority opinion is clear that an extension is a "a disfavored judicial activity" in which the "watchword is caution." *Id*. at 1803. It is simply to say that extensions are not categorically barred and will be permissible in at least some circumstances.[3] This is one of those circumstances.

The fact that extensions of *Bivens* are available in at least some—albeit narrow—circumstances is crucial to the proper application of the special factors test. If the application of this test would foreclose an extension in *every* case, then the test is at odds with controlling precedent. Consider the following illustration: suppose that a plaintiff sought from this Court an extension of *Bivens* and the Court held that a "special factor counseling hesitation" was the fact that the imposition of damages would adversely impact the financial resources of the federal government. Application of this special factor would be inappropriate because, given that *all Bivens* actions will adversely impact the federal government's financial resources, it would have the effect of barring *every* extension of *Bivens*. That would not be faithful to precedent.

---

[3] Fourth Circuit precedent further reinforces the conclusion that extensions are not categorically prohibited. In its post-*Egbert* Eighth Amendment cases, this Court has never suggested that extensions were categorically barred and that the two-step test for recognizing a *Bivens* action was instead only a single step. Indeed, this Court recently mandated such an approach, stating "a court *must* engage in a 'two-step inquiry' when analyzing would-be *Bivens* claims." *Mays v. Smith*, 70 F.4th 198, 202 (4th Cir. 2023) (emphasis added); *see also Bulger v. Hurwitz*, 62 F.4th 127, 137 (4th Cir. 2023).

\* \* \*

In sum, Supreme Court and Fourth Circuit precedent is clear that extensions of *Carlson* are not categorically prohibited and will be available in at least some circumstances. Further, this insight informs the proper application of special factors when an extension is sought. A special factor may not be applied in a way that would have the effect of barring *every* extension of either *Bivens*, *Davis*, or *Carlson*. Any analysis that would produce that result is at odds with controlling precedent.

## III. Special Factors Do Not Counsel Hesitation in this Case.

A modest extension of *Bivens* is justified here because there are no special factors that, when properly applied, stand in the way of an extension. As explained in detail below, an extension is not blocked by (1) the possibility of systemwide consequences, (2) the potential impairment of officers' discharge of their duties, or (3) the availability of alternative remedies. Each of these factors is discussed below and none are sufficient to counsel against an extension in this instance.

Before discussing each of these factors, however, a word is in order on the proper definition of a "special factor." As the Supreme Court itself has admitted, it has never "defined the phrase 'special factors counseling hesitation,'" *Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017), and lower courts have not adopted a uniform set of factors. Indeed, there are some discrepancies within the Fourth Circuit's own case

11

law regarding the identification of a special factor.[4] More relevant to the present context, some might deem the Court's recent identification of a "single question" underlying the *Bivens* inquiry (*i.e., "*whether there is any reason to think that Congress might be better equipped to create a damages remedy") to be its own special factor. *Egbert v. Boule*, 142 S. Ct. 1793, 1798 (2022). This "single question," however, is better understood as a statement of general principle—a principle that animates each of the special factors that have been applied in prior *Bivens* cases.

---

[4] In *Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023), this Court quoted to *Tate v. Harmon*, 54 F.4th 839 (4th Cir. 2022) for the following non-exhaustive list of special factors:

> (1) uncertainty alone as to whether allowing a *Bivens* claim would have systemwide consequences; (2) a new category of defendants; (3) a difference as small as the rank of the officers involved; (4) the statutory or other legal mandate under which the officer was operating; (5) a potential effect on foreign relations and national security: (6) Congress[ ] repeatedly declin[ing] to authorize the award of damages in the relevant context; and (7) the risk that the burden and demand of litigation would prevent Executive Officials from devoting the time and effort required for the proper discharge of their duties.

*Bulger*, 62 F.4th at 140 (quoting *Tate*, 54 F.4th at 846) (internal quotations and citations omitted).

Yet, in *Tate* itself, the Court did not refer to those seven factors as special factors; rather, the court described them as "distinguishing factors . . . that would support finding a new context." *Tate*, 54 F.4th at 846. To be sure, as the Supreme Court noted in *Egbert*, there is sometimes overlap between the factors used to determine a "new context" and the factors that count as "special factors." *Egbert*, at 1803-04; *see also Bulger*, 62 F.4th at 140 (noting "overlap"). This overlap is not universal, however, and some "new context" factors have never been treated as "special factors."

### A.      The Uncertainty of Systemwide Consequences

In *Egbert*, the Court stated that the difficulty of "predict[ing] the systemwide consequences of recognizing a cause of action under *Bivens* . . . is a special factor that forecloses relief."[5] *Id.* at 1803–04 (internal citation omitted). The Court cited *Ziglar* for this proposition, but in neither *Egbert* nor *Ziglar* did the Court explicitly apply this factor. The exact contours of this factor are thus unclear. What is clear, however, is that the potential for systemwide consequences must rise far above the level of rank speculation. If that level of uncertainty were enough to bar a *Bivens* extension, then every *Bivens* extension would be barred and the two-step inquiry that has been repeatedly reaffirmed would be truncated to a single step.

The Fourth Circuit correctly articulated this understanding of "systemwide consequences" in *Bulger v. Hurwitz*, 62 F.4th 127 (4th Cir. 2023). In *Bulger,* the Court considered a claim that the BOP's decision to house an inmate in the general population unconstitutionally exposed him to a risk of harm. *Id.* at 134-35. The Court rejected a *Bivens* extension in that case because housing decisions of the sort challenged "are typically the subject of broad policies and systemwide procedures that involve a multitude of decisionmakers on almost every level of the BOP's

---

[5] The district court appeared to apply this special factor when discussing the "entangl[ing] the federal judiciary in byzantine issues of prison administration and institutional security." JA 106.

organizational hierarchy." *Id*. at 141-42. Given this, the Court held that it was "ill-suited to 'predict the systemwide consequences of recognizing a cause of action under *Bivens.*'" *Id*. at 142 (quoting *Egbert*, 142 S. Ct. at 1803-04).

This Court's application of "systemwide consequences" as a special factor in *Bulger* is consistent with the principle that a special factor cannot be applied in a way that would categorically foreclose an extension. Not every constitutional violation will challenge a facility's "broad policies and systemwide procedures." In addition, the Court's approach in *Bulger* comports with a commonsense understanding of the phrase. Decisions about where prisoners are located and who they are surrounded by are ones that most people would consider to be systemic or managerial. On the other hand, the use of excessive force by a rogue, front-line officer in a particular instance will rarely implicate systemic or managerial concerns.

The more recent case of *Mays v. Smith,* 70 F.4th 198 (4th Cir. 2023) also addressed the "systemwide consequences" special factor. In *Mays*, an inmate alleged that prison officials terminated his prison employment and transferred him to another institution because of his race and without providing him any due process. *Id*. at 201. *Mays,* like *Bulger,* thus implicated "broad policies and systemwide procedures" related to housing and prison employment. Even if the injuries to the inmate could be described as "individual instances of discrimination and law enforcement overreach," this Court nonetheless ruled that recognizing an extension "could open

the door for increased litigation over the myriad decisions made every day regarding inmate discipline, transfer, and employment across the entire BOP system." *Id*. at 206.

As in *Bulger*, this Court in *Mays* did not hold that *every Bivens* extension would be barred by the potential for systemwide consequences, only that a certain subset of extensions would be barred. *Mays* thus illustrates, as *Bulger* does, the distinction between the individual nature of an excessive force claim (which does not implicate systemwide concerns) and the systemwide nature of housing or employment claims (which, because they are made by multiple, high-ranking people and entities exercising discretionary authority, do implicate systemwide concerns). Mr. Fields' excessive force claim hinges on the actions of individual officers at a discrete time and place and does not implicate any policies or high-ranking decisionmakers.

Supreme Court precedent confirms this view. In *Ziglar v. Abassi*, the plaintiffs alleged that they were subject to an unconstitutional policy targeting persons of Arab descent in the wake of the September 11 attacks. 582 U.S. 120, 128-29 (2017). A challenge to this policy, the Supreme Court observed, would necessarily "require inquiry and discovery into the whole course of the discussions and deliberations that

led to the policies and governmental acts being challenged." *Id*. at 141.[6] The Court continued: "Even if the action is confined to the conduct of a particular Executive Official in a discrete instance, these claims would call into question the formulation and implementation of a general policy." *Id*. *Bivens* actions, the Court explained, are for challenging "standard law enforcement operations," *id.* at 142 (quotations omitted), and are not to be used as a "vehicle for altering an entity's policy." *Id*. at 140 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

The lesson of *Ziglar*, *Bulger*, and *Mays* is that the potential for systemwide consequences only counts as a special factor if a judicial decision would disrupt "broad policies and systemwide procedures." If a suit instead only challenges "standard law enforcement operations," the "systemwide consequences" special factor does not apply. In this case, Fields challenges only the discrete actions of front-line officers engaged in "standard law enforcement actions." Indeed, because BOP policy prohibits officers from using excessive force, Fields is not challenging a general policy but instead urging *compliance* with a general policy. This special factor, therefore, does not block his claim here.

---

[6] It is unclear whether *Ziglar* applied the "systemwide consequences" special factor (which is being discussed here) or instead applied the "discharge of duties" special factor (which is discussed in the following section). To the extent that these statements are consistent with the concerns raised in *Bulger* and *Mays*, they are noted here to confirm the correct understanding of this special factor.

**B.     Impact on Officers' Discharge of Their Duties**

Another special factor that may block an extension of *Bivens* is the impact of the extension on officers' discharge of their duties. The Court appeared to apply this factor in *Ziglar v. Abbasi* and then again in *Egbert v. Boule*. *Ziglar*, as noted above, involved the alleged mistreatment of Arab detainees in the wake of the September 11 attacks. Important to the Court in *Ziglar* was not just that the detainees were challenging a particular detention policy, but also that the detainees had named as defendants three high-ranking executive officials: "Attorney General John Ashcroft, former FBI Director Robert Mueller, and former Immigration and Naturalization Service Commissioner James Ziglar." *Ziglar*, 582 U.S. at 129. Regarding these three defendants *only*, the Court held that a *Bivens* extension would inappropriately interfere with the discharge of their duties, stating:

> Even if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy. This, in turn, would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged. These consequences counsel against allowing a *Bivens* action against the Executive Officials, for the burden and demand of litigation might well prevent them—or, to be more precise, future officials like them—from devoting the time and effort required for the proper discharge of their duties.

*Id*. at 141.

Thus, the Court's reluctance to interfere with "proper discharge of [the officer's] duties" derived from the fact that an extension in this instance would

require high-ranking executive officers to defend the "formulation and implementation of a general policy." Tellingly, with regard to the low-ranking officers also sued in *Ziglar* (a warden and two assistant wardens), the Court did *not* rely on this factor in denying a *Bivens* action. *Id*. at 142-45. *Ziglar* thus makes clear that not *every* lawsuit will impermissibly interfere with a federal officer's discharge of their duties, even though a minimal level of interference is unavoidable in every suit. Suits against high-ranking officers such as an attorney general will impermissibly interfere with the discharge of duties, but suits against lower ranking officers such as a warden or assistant warden will not.

The Supreme Court appeared to apply this special factor in a different circumstance several years later in *Egbert v. Boule*. There, the Court rejected a First Amendment retaliation claim because extending *Bivens* to that context would unleash a cascade of potentially frivolous suits that would nonetheless progress through to a trial and put a strain on the defendant officers. As the Court put it,

> A plaintiff can turn practically any adverse action into grounds for a retaliation claim. And, because an official's state of mind is easy to allege and hard to disprove, insubstantial claims that turn on [retaliatory] intent may be less amenable to summary disposition. Even a frivolous retaliation claim threatens to set off broad-ranging discovery in which there is often no clear end to the relevant evidence.

*Egbert v. Boule*, 142 S. Ct. 1793, 1807 (2022) (internal citations and quotations omitted).

Importantly, the Court did not apply this factor to the Fourth Amendment excessive force claim alleged in *Egbert*. That claim was barred, but only because it implicated national security concerns and because alternative remedies existed. *Id*. at 1804-07. The Court's differential treatment of the excessive force and retaliation claims in *Egbert* makes clear that this special factor only applies when the claim would apply to an extraordinarily broad range of conduct ("a plaintiff can turn practically any adverse action into grounds for a retaliation claim") that will almost certainly be litigated past the pleading stage and through discovery or a trial ("[e]ven a frivolous retaliation claim threatens to set off broad-ranging discovery"). That is a far cry from the situation here.

The Fourth Circuit has not explicitly applied the "discharge of duties" special factor, but in *Tate v. Harmon*, 54 F.4th 839 (4th Cir. 2022), this Court did invoke concerns like those raised in *Ziglar*. *Tate* involved "a broad-based, systemic claim against an array of federal officials" including a "Regional Director of the Bureau of Prisons." *Id*. at 846. This Court did not imply a *Bivens* remedy because, "by its very nature, Tate's claim would expand prison officials' liability from previous *Bivens* actions to systemic levels." *Id*.

In sum, a *Bivens* extension may be barred when it would interfere with high-ranking officials' decisions on how to implement systemwide policies. Fields does not allege that a high-ranking officer erred in implementing systemwide policies.

Instead, he merely alleges that low-level BOP employees violated BOP policy by using excessive force against himself. As such, Fields' claim is not barred by this special factor.

### C.    The Existence or Clear Rejection of Alternative Remedies

The existence or clear rejection of alternative remedies is a third "special factor" that potentially applies in this case. Although this Court and the Supreme Court have refused to extend *Bivens* because of the existence of alternative remedies in the past, there is no reason to do so here. First, while remedies under the BOP's administrative remedy program have been held to block an extension, that has only occurred when the remedial program is in fact operational. In this instance, rogue officers rendered the program inoperable as it pertains to Fields, and thus his action should not be blocked. Second, the putative availability of remedies under the Federal Tort Claims Act (FTCA) is irrelevant here because the Supreme Court has held that those remedies do not block an extension.

### 1.  The BOP's Administrative Remedy Program Does Not Block an Extension

The existence of alternative remedies has figured prominently in the Supreme Court's *Bivens* jurisprudence. Their prominence stems from the purpose of *Bivens* actions: "deterring the unconstitutional acts of individual officers." *Egbert v. Boule*, 142 S. Ct. 1793, 1806 (2022). Civil actions for damages, of course, are not the only method of deterring unconstitutional conduct. A variety of criminal and

administrative programs may achieve the desired deterrent effect. Where Congress or the Executive has developed a remedial program that calibrates remedies to achieve the desired level of deterrence, the Supreme Court typically refuses to create a *Bivens* action. As the Court has explained, "[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.* at 1807.

It follows from these principles that, where rogue officers have nullified a remedial program with regard to a specific prisoner, the operation of the program will no longer represent the will of Congress or the Executive. Nor will the program deliver the carefully calibrated level of deterrence that would justify this Court staying its *Bivens* hand. This is exactly the circumstance presented here. When Fields attempted to utilize the BOP's Administrative Remedy Program, he was denied access to the program by two officers acting ultra vires. JA 026. Thus, regarding Fields, recognizing a *Bivens* action here will not interfere with the BOP's carefully calibrated system of deterrence. That carefully calibrated system has already been disrupted by a rogue officer. If anything, a *Bivens* action will further the desires of the Executive by imposing at least some deterrence for misconduct.

This approach to alternative remedies mirrors the current approach to the exhaustion of remedies under the Prisoner Litigation Reform Act (PLRA). The

PLRA requires that prisoners exhaust their administrative grievances before filing a lawsuit. 42 U.S.C. § 1997e(a). However, the requirement is not unyielding. As the Supreme Court has explained, a prisoner need not exhaust administrative remedies that are "unavailable." *Ross v. Blake*, 578 U.S. 632, 642 (2016). A remedy is deemed unavailable "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 643. Crucially for present purposes, a prisoner's inability to exhaust need not be part of a widespread administrative breakdown. Even a single, isolated act that bars access to the administrative program is enough to excuse the prisoner's failure to exhaustive administrative remedies. *Id*.

To be clear, Fields is not arguing here that the BOP remedial program, when operating as designed, is insufficient to provide him the remedy he seeks. Precedent holds that the BOP's choice as to the appropriate level of deterrence must be respected and it is not this Court's place to "second-guess" the chosen level of deterrence. *Egbert*, 142 S. Ct. at 1807. Fields is instead arguing that, where an alternative remedial system has broken down, that remedial system should not count as a special factor blocking a *Bivens* action any more than his failure to exhaust his remedies in the same context would block a *Bivens* action under the exhaustion requirement.

This conclusion follows not simply from the logic underlying the exception to the exhaustion requirement, but it also follows from Supreme Court precedent. In *Correctional Services Corp. v. Malesko*, the Supreme Could held that a federal prisoner may not pursue a *Bivens* action because the prisoner had "full access" to the "BOP's Administrative Remedy Program." 534 U.S. 61, 74 (2001). The Court was careful to note that the prisoner there had "full access" to the program. Where a prisoner does not have "full access," the administrative remedy does not hold the same force. Fields did not have "full access" to his purported alternative remedy because a rogue officer denied him such access. Thus, in keeping with *Malesko*, his *Bivens* action is not barred here.

Further, in cases where the Court has stayed its hand in deference to alternative remedies, it has often noted that the alleged alternative remedies were in fact available to the *Bivens* plaintiff. In *Egbert*, for example, the Court noted that plaintiff there "took advantage of [an administrative] grievance procedure, prompting a year-long internal investigation into Agent Egbert's conduct." *Egbert*, 142 S. Ct. at 1806. Similarly, in *Chappell v. Wallace*, a case arising in the military context, the Court refused a *Bivens* remedy in deference to an administrative remedy and was careful to note that at least one of the original plaintiffs "availed himself of his remedy" through an administrative remedial program. 462 U.S. 296, 303 n.1 (1983).

To be sure, this Court observed in *Bulger v. Hurwitz* that "the potential unavailability of a remedy in a particular circumstance does not warrant supplementing that scheme." 62 F.4th 127, 141 (4th Cir. 2023). Yet this Court there was referring to a scheme that was in effect and operational. In that circumstance, Congress' preferences about level and manner of deterrence are realized. If Congress desires that the remedy be small or nonexistent, then Congress' wishes must be carried out and courts must stay their *Bivens* hand. But when a remedial scheme is not operational—i.e., when a rogue officer disrupts the scheme such that it is "unavailable" and "operates as a simple dead end"—Congress' wishes about the level and manner of deterrence are not realized. A *Bivens* action in this narrow context would not trample on Congress' or the Executive's objectives but would instead step into a void created by a rogue officer and realize those objectives.

Crucially, if this Court were to hold otherwise—i.e., if it were to hold that the BOP's grievance process, whether operational or not, displaced *all* constitutional damages actions—then extensions of *Carlson* would be categorically barred. As explained in detail above, however, the Supreme Court has refused to categorically bar extensions to any of the three original *Bivens* actions. Thus, to comply with binding precedent, there must be at least one circumstance in which the BOP's grievance process would *not* constitute an alternative remedy blocking a *Bivens* extension. The circumstance presented here—where Fields was denied "full access"

to alleged alternative remedy—is the best candidate for rendering the doctrine coherent because it is consistent with the well-established exception to the exhaustion requirement.[7]

## 2. FTCA Remedies Are Not Relevant Here

In certain circumstances, a person detained in a federal facility may seek relief for injuries under the FTCA. Whether Fields might have a remedy under the FTCA, is irrelevant here though because *Carlson v. Green*, 446 U.S. 14 (1980) holds that such remedies do not foreclose relief here.

In *Carlson,* a federal prisoner sought damages under the Eighth Amendment. In considering whether to permit the action, the Supreme Court recognized that the

---

[7] Two of circuit court opinions cited by the district court that refused to extend *Carlson* mistakenly adopted the BOP's grievance procedure as a categorical (or almost categorical) bar to extensions of *Bivens* claims by federal prisoners. JA 107 (citing *Silva v. United States*, 45 F.4th 1134, 1141–42 (10th Cir. 2022)) and *Greene v. United States*, No. 21-5398, 2022 U.S. App. LEXIS 25630, at *8 (6th Cir. Sept. 13, 2022) (unpublished). The last case, *Alsop v. Fed. Bureau of Prisons*, merely cited to a previous Third Circuit opinion refusing to extend *Carlson*. JA 107 (citing No. 22-1933, 2022 U.S. App. LEXIS 30806, at *6 (3d Cir. Nov. 7, 2022)).

That previous Third Circuit decision, *Mack v. Yost*, had *not* treated the BOP's grievance system as a categorical bar. In that case, the existence of alternative remedies and separation of powers concerns prevented the creation of a damages remedy for a First Amendment retaliation claim where a prisoner had been fired from his commissary job because he complained "that correctional officers were harassing him at work because of his religion." 968 F.3d 311, 314 (2020). The Third Circuit correctly noted that "hiring and firing decisions" for work assignments are "BOP's administrative decisions" that should not be intruded upon by federal courts. *Id*. at 322. Of course, *Egbert* ruled out the existence of a *Bivens*-type remedy for a First Amendment retaliation claim. *Egbert*, 142 S. Ct. 1793, 1807 (2022).

FTCA would, according to the allegations in the complaint at least, also provide relief. *Id*. at 19. Yet, the Court did not find this remedy to be a bar to a *Bivens* claim. *Id*. at 20. The Court held that the "FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy." *Id*. at 23.

The Supreme Court has never overruled *Carlson.* Admittedly, since *Carlson*, the Court has taken a different view of alternative remedies in its *Bivens* jurisprudence. Now, the general rule is that "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Ziglar v. Abbasi*, 582 U.S. 120, 145 (2017). Thus, for example, the Court has held that a *Bivens* action is unavailable for the wrongful termination of federal employment or the denial of social security benefits because, in both instances, Congress has created a statutory scheme to address the alleged misconduct. *See Schweiker v. Chilicky*, 487 U.S. 412 (1988); *Bush v. Lucas*, 462 U.S. 367 (1983). Although these decisions approach alternative remedies differently than in *Carlson*, the Court has never explicitly overruled *Carlson* itself.

Indeed, in the many cases where the Court has refused a *Bivens* action, it has never cited the apparent availability of a FTCA claim as an alternative remedy blocking an extension. In *Egbert*, for example, the plaintiff had "filed an administrative claim with Border Patrol pursuant to the Federal Tort Claims Act."

26

*Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022). Instead of holding that the extension was barred by the availability of a FTCA remedy, however, the Court held only that the extension was barred by the BOP's administrative remedy program.

Although the Supreme Court has never explicitly overruled *Carlson*, one might be tempted to infer that the case has been implicitly overruled. Yet the Supreme Court has forbidden lower courts from making such inferences. As the Court has explained, "[i]f a precedent of [the Supreme] Court has direct application in a case yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 483 (1989); *see also Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.") (quotation omitted); *United States v. Danielczyk,* 683 F.3d 611, 615 (4th Cir. 2012) ("lower courts should not conclude that the Supreme Court's more recent cases have, by implication, overruled [its] earlier precedent") (internal quotation marks omitted).

*Carlson*'s holding that the FTCA does not displace a *Bivens* action has "direct application in [this] case." Although *Carlson* may "appear[] to rest on reasons rejected" in its more recent *Bivens* decisions," this Court is obliged to "follow the

case which directly controls"—*Carlson*—and "leave[]to [the Supreme] Court the prerogative of overruling" the case. Whatever remedies Fields might have under the FTCA, therefore, are irrelevant to the availability of a *Bivens* action.

\*   \*   \*

Just like the plaintiff in *Carlson*, Mr. Field's claim is "narrow and discrete, implicating well-established criteria for liability and damages." *Tate v. Harmon*, 54 F.4th 839, 846 (4th Cir. 2022). His claim challenges no systems or policies and is subject to a high standard on the merits. And because his access to the BOP's administrative remedies was thwarted, recognizing a remedy here would not impede on the will of Congress or the Executive.

## CONCLUSION

For the reasons stated above, Appellant Andrew Fields, III respectfully asks that the district court's opinion be reversed, and Field's claim be allowed to proceed to discovery.

## STATEMENT REGARDING ORAL ARGUMENT

As this is a case of first impression for this Court, and there is little guidance from other Courts of Appeals, Appellant requests oral argument and believes it would be beneficial.

SUBMITTED BY:

John F. Preis
Professor of Law
THE UNIVERSITY OF RICHMOND
SCHOOL OF LAW
203 Richmond Way
Richmond, VA 23173
(804) 289-8682
jpreis@richmond.edu

Danny Zemel
THE KRUDYS LAW FIRM, PLC
919 East Main Street
Suite 2020
Richmond, VA 23219
(804) 774-7950
dzemel@krudys.com